[Cite as *State v. Unger*, 2017-Ohio-8823.]

COURT OF APPEALS
COSHOCTON COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| STATE OF OHIO | : | JUDGES: |
| | : | Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | |
| ERIC UNGER | : | Case No. 2017CA0001 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:          Appeal from the Municipal Court,
                                                          Case No. CRB1600818




JUDGMENT:                                     Affirmed




DATE OF JUDGMENT:                      December 4, 2017




APPEARANCES:

For Plaintiff-Appellee                        For Defendant-Appellant

RICHARD J. SKELTON                      JEFFREY G. KELLOGG
760 Chestnut Street                          5 South Washington Street
Coshocton, OH  43812                       Millersburg, OH  44654

*Wise, Earle, J.*

{¶ 1}   Defendant-Appellant, Eric Unger, appeals his February 9, 2017 conviction by the Municipal Court of Coshocton County, Ohio.   Plaintiff-Appellee is the state of Ohio.

## FACTS AND PROCEDURAL HISTORY

{¶ 2}   On October 18, 2016, appellant was charged with cruelty against companion animals in violation of R.C. 959.131(D)(2), a misdemeanor in the second degree.   Said charge arose from the removal of his dog "Yap" from his mother's home on September 23, 2016.[1]

{¶ 3}   A bench trial commenced on February 8, 2017.   By judgment entry filed February 9, 2017, the trial court found appellant guilty, and sentenced him to forty days in jail, thirty days suspended in lieu of compliance with three years of probation.   The trial court also ordered appellant to forfeit his dog to the Humane Animal Treatment Association, and prohibited him from owning or caring for any companion animals for three years.

{¶ 4}   Appellant filed an appeal and this matter is now before this court for consideration.   Assignment of error is as follows:

I

{¶ 5}   "THE DEFENDANT'S CONVICTION FOR PROHIBITION CONCERNING COMPANION ANIMALS IN VIOLATION OF R.C. 959.131(D)(2) WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."

---

[1]Several dogs were removed from his mother's home.  This case is limited to Yap.  A companion case involves a dog named "Bruiser" and his registered owner, Michelle Unger, appellant's mother (App. No. 2017CA0009).

I

{¶ 6}   In his sole assignment of error, appellant claims his conviction for cruelty against companion animals was against the sufficiency of the evidence.  We disagree.

{¶ 7}   On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction.  *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991).  "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 8}   Appellant was convicted of cruelty against companion animals in violation of R.C. 959.131(D)[2] which states the following:


(D) No person who confines or who is the custodian or caretaker of a companion animal shall negligently do any of the following:

(1) Torture, torment, or commit an act of cruelty against the companion animal;

(2) Deprive the companion animal of necessary sustenance or confine the companion animal without supplying it during the confinement with sufficient quantities of good, wholesome food and water if it can

---

[2]The statute was amended effective September 13, 2016.  The old (D)(2) subsection dealt with being the owner of a kennel.  The new subsection applied to any custodian or caretaker; therefore, appellant was properly charged for his actions that occurred between September 13, and 23, 2016.  In addition, appellant never raised this issue to the trial court.

reasonably be expected that the companion animal would become sick or suffer in any other way as a result of or due to the deprivation or confinement;

(3) Impound or confine the companion animal without affording it, during the impoundment or confinement, with access to shelter from heat, cold, wind, rain, snow, or excessive direct sunlight if it can reasonably be expected that the companion animal would become sick or suffer in any other way as a result of or due to the lack of adequate shelter.

{¶ 9}   Russell Dreher, the county Dog Warden, testified on September 21, 2016, he was called for a dog at-large complaint.  T. at 19.  Mr. Dreher observed the loose dog (Bruiser) on the steps of a home wherein appellant lived.  T. at 21.  He took custody of the dog and asked dispatch to contact the owner, Michelle Unger, but dispatch was unable to make contact with her.  T. at 22.  He took pictures of the dog and turned him over to the animal shelter.  T. at 24-25; Plaintiff's Exhibit B.  On September 23, 2016, he returned to the home because of a message left on his cell phone of another possible loose dog on the Unger steps.  T. at 26.  On same date, Ms. Unger called and told Mr. Dreher she was not at home as she was out on the road working.  T. at 27.  Mr. Dreher told Ms. Unger he was at the home and could see a dog in the closed-in porch that was "almost starved to death and it was in very bad shape and I needed someone to come to the house now to get this dog out."  T. at 28.  Ms. Unger replied her son was in the home and she would contact him.  *Id.*  Thereafter, appellant and two females exited the home.  *Id.*  Mr. Dreher told appellant to bring out all the dogs so he could take them to

the humane society. *Id.* Appellant brought out four dogs including the dog on the porch named "Yap." *Id.* Mr. Dreher took pictures and a video of Yap's condition. T. at 29-30; Plaintiff's Exhibits A and D. In the video, Yap is scene eating "vigorously." T. at 31. The dog was "doing everything it could to eat as much as possible." T. at 36. Appellant told Mr. Dreher his mother hired John Collins to care for the dogs when they were not home. T. at 32, 45, 51. Mr. Collins told Mr. Dreher he watched the dog for a couple days and then left for an emergency. T. at 47, 49. Mr. Dreher issued a citation to appellant for cruelty to animals because of Yap's condition. T. at 33-34.

{¶ 10} Dr. Christy Nicely, a veterinarian, observed a picture of Yap taken in September and scored him a one out of nine, with five being ideal. T. at 65-66. When she saw Yap almost a month later, she scored him a four out of nine. *Id.* Dr. Nicely opined it would take several weeks for a dog like Yap to get all the way to a one. T. at 67. Yap had hookworms, fleas, flea dirt, and dental tartar. T. at 67-68, 73. When asked if the dog initially scored low because of the hookworms or because he was deprived of food, Dr. Nicely opined, "I believe deprived of food" because he was not treated for the hookworms during the time he improved. T. at 69.

{¶ 11} Ivy Farley, a humane society employee, went to the home the day before the dogs were removed. T. at 80-81. She went to a side door and observed two empty bowls, no food, no water, and Yap who "looked like a skeleton." T. at 81. When she saw the dogs the next day, she opined their health was "[v]ery poor" and it appeared they had not been fed. T. at 82-83. The dogs were very hungry. T. at 83.

{¶ 12} Christina Sturtz, the county Humane Agent, testified she observed Yap and opined he appeared emaciated and lacked both water and food. T. at 100. She

stated when given food and water, Yap reacted "typical of the animals I have seen deprived of food and water. They don't know whether to eat or drink. It's a back-and-forth thing." T. at 100-101.

{¶ 13} John Collins testified Ms. Unger asked him to take care of the dogs which he did for a couple of days, but then left because "I had something I had to do and I wasn't feeling good." T. at 110-111. He called another person that Ms. Unger had arranged to watch the dogs "if something ended up happening." T. at 111. That person came to the house and he left. *Id.* He never received payment for watching the dogs. T. at 110, 113. No one in the home left him with any dog food to care for the dogs. T. at 112-113. He stated he "walked around Coshocton, gathered up cans, and got a $5 bag of dog food because this is as much cans as I could get and fed them." T. at 112. When shown a picture of Yap taken at the time he was removed from the home, Mr. Collins stated the dog already looked like that before he was asked to care for the dog. T. at 111-112. On cross-examination, he stated he never knew Yap was at the home. T. at 114-115. When confronted with the discrepancy, Mr. Collins explained he did not know which dogs were which. T. at 119.

{¶ 14} In defense, appellant called Brenda Roberts and Cody Weese. Ms. Roberts lived in the Unger home in September of 2016. T. at 124. She testified Ms. Unger and appellant cared for the dogs, giving them food and water and taking them outside. T. at 125, 129. When Ms. Unger went on the road for work, she made arrangements with Mr. Collins and a Jessica Jensen to care for the dogs. *Id.* Ms. Roberts observed Ms. Unger hand them money. T. at 126. When Ms. Unger left the house, the dogs were "in great condition," which was four days before they were

removed by the dog warden.  T. at 126, 132.  Ms. Roberts stated Mr. Collins left after three days and did not make arrangements with anyone else to care for the dogs.  T. at 127.  She admitted two of her dogs were also taken by the dog warden and she was facing charges.  T. at 135-136.

{¶ 15} Mr. Weese, a family friend, testified Ms. Unger always took care of the dogs, making sure food and water were available, and he saw appellant feed Yap.  T. at 139, 143-144.  Ms. Unger always made arrangements for someone to care for the dogs when she left to go out on the road.  T. at 141.  He overheard Ms. Unger talking on the telephone about giving Mr. Collins $50 to watch the dogs.  *Id.*

{¶ 16} We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact.  *State v. Jamison,* 49 Ohio St.3d 182, 552 N.E.2d 180 (1990).  The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page."  *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

{¶ 17} After entertaining all of the testimony and evidence, the trial court found Mr. Collins "was one of the least believable witnesses I've heard in a few days.  The Court concludes that in spite of Mr. Collins the State has proven all of the charges of the defendants beyond a reasonable doubt."  T. at 154.

{¶ 18} Given the testimony and the evidence presented, we find sufficient evidence to support the conviction.  Appellant was the registered owner of Yap.  Mr. Dreher, Ms. Farley, and Ms. Sturtz testified to Yap looking emaciated and being very hungry.  Dr. Nicely explained although Yap had hookworms, the hookworms were not the cause of his appearance because his condition improved after he was given food

and water. She opined Yap was deprived of food, and it took several weeks for him to reach the condition he was in at the time of his removal from the home. Appellant was at home during this extended time period. Yap's ribs were clearly visible in the photographs.

{¶ 19} Upon review, we find sufficient credible evidence to establish the elements of R.C. 959.131(D)(2).

{¶ 20} The sole assignment of error is denied.

{¶ 21} The judgment of the Municipal Court of Coshocton County, Ohio is hereby affirmed.

By Wise, Earle, J.

Delaney, P.J. and

Hoffman, J. concur.

EEW/sg 1122